Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 25, 2018

**2018 CO 62**

**No. 14SC990, Castillo v. People—Self-Defense—Initial Aggressor—Jury Instructions.**

The defendant fired a gun at several people in a parking lot.  He asserts he did this in self-defense.  Over the defendant's objection, the trial court instructed the jury on two exceptions to the affirmative defense of self-defense: initial aggressor and provocation.  The jury convicted the defendant of several criminal charges.  The supreme court concludes the division of the court of appeals erred when it determined that the trial court correctly instructed the jury on the initial aggressor exception to self-defense.  The supreme court further concludes the error was not harmless in light of the prosecution's repeated references to the initial aggressor exception during closing argument.

## 2018 CO 62

**Supreme Court Case No. 14SC990**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 10CA1477

**Petitioner:**

Andres Castillo,

v.

**Respondent:**

The People of the State of Colorado.

**Judgment Reversed**
*en banc*
June 25, 2018

**Attorneys for Petitioner:**
Douglas K. Wilson, Public Defender
Ned R. Jaeckle, Deputy Public Defender
*Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
Brock J. Swanson, Assistant Attorney General
*Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE COATS** dissents, and **JUSTICE BOATRIGHT** joins in the dissent.

¶1     Petitioner Andres Castillo admits that he fired a shotgun at several people, including two police officers, in a crowded parking lot after a night out celebrating his wife's birthday in downtown Denver. But he claims he acted in self-defense. Driving a car occupied by his wife and several friends, Castillo tried to exit a parking lot, when an unknown assailant opened fire on his car. At some point during this episode, Castillo got out of the car, retrieved a shotgun from his trunk, and returned fire. Nearby police officers then rushed to the scene and began firing at Castillo from a different direction. He turned and shot back. Castillo testified that he didn't realize his targets were police officers; he claimed that he thought they were associated with the initial shooter.

¶2     Charged with multiple counts of attempted first degree murder and first and second degree assault, Castillo asserted self-defense at trial. The trial court instructed the jury on self-defense but, over Castillo's objection, also instructed the jury on two exceptions to self-defense: initial aggressor and provocation. The jury found Castillo guilty of several offenses.

¶3     As relevant here, a division of the court of appeals found that (1) the trial court did not err in giving the initial aggressor jury instruction, and (2) while the trial court did err in giving the provocation jury instruction, the error was harmless. We granted certiorari to address whether the division erred in reaching these conclusions.

¶4     We conclude that the trial court erred in giving the initial aggressor jury instruction because there was no evidence to support the instruction. We further conclude that the error was not harmless. We do not reach the issue of whether giving

the provocation jury instruction was harmless error because Castillo is entitled to a new trial regardless, and the trial court can avoid the error on retrial.

¶5 Therefore, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶6 One Saturday night, Castillo visited a nightclub in downtown Denver with his wife, his cousin, and two friends to celebrate his wife's birthday. They stayed until the club closed.

¶7 Closing time in downtown Denver often unleashes a flood of people into the streets. The Denver Police Department calls the resulting sea of humanity "outcrowds." Because fights and other disturbances are common, police are typically present and vigilant.

¶8 This night proved to be no exception. As Castillo and his group left the club, they walked through an alley lining the parking lot where Castillo's car was parked. In the alley, they passed a group of men who appeared to be fighting or about to fight. Castillo's group did not get involved. Instead, they kept walking to Castillo's car.

¶9 Denver Police Sergeant Lombardi monitored the outcrowds that night. He saw a group of twenty to thirty people either fighting or about to fight. When he called for backup, several officers joined him. Among them was Officer Simmons, who trained his spotlight on the skirmish, causing the would-be combatants to disperse.

¶10 Meanwhile, Castillo's group reached Castillo's car. Castillo hopped into the driver's seat, rolled down his window, and started backing out of his parking spot. A

3

man—who was never identified—said something to Castillo through the open driver's door window. Castillo said something in return. Castillo testified that he couldn't remember what he said. When asked if he threatened the man, Castillo responded that he did not.

¶11    What happened next is less clear. Partially conflicting testimony at trial described two possible sequences.

¶12    According to most witnesses, including Castillo, Castillo backed his car out of the parking spot and started moving the car toward 18th Street to leave the parking lot. There were cars in front of him, so he drove slowly. Someone then started firing at Castillo's car from the direction of 19th Street, hitting Castillo's car. Castillo popped the trunk, got out of his car, walked to the rear of his car, removed a shotgun from the trunk, and fired several rounds toward the area where the shots originated.

¶13    On the other hand, Jennifer Strong (who was in the back seat of the car at the time) testified on direct examination by the People that Castillo cursed at the man who said something to Castillo as the man walked by. According to Strong's testimony on direct, after the verbal exchange with the man, Castillo stopped the car, popped open his trunk, and got out of the car.[1] Only then did someone start firing at Castillo's car.

---

[1] The division suggests that Strong testified differently on direct and cross regarding the timing. People v. Castillo, 2014 COA 140M, ¶ 18, __ P.3d __ ("[O]ne person in defendant's car testified, at least on direct examination, that she heard gunshots after defendant got out of the car and thus also after he popped open the trunk (although on cross-examination, she stated she heard gunshots when defendant got out of the car)."). However, we see little difference in her testimony. On direct, the People asked, "After Andy got out of the car and cursed at this guy, what happened next?" Strong

4

Castillo walked to the rear of his car, removed a shotgun from the trunk, and then fired several rounds in the apparent direction of the initial shooter.

¶14 Under either version, however, Castillo opened the trunk before getting out of his car, and the gunshots started before Castillo got to his trunk. The initial shooter was never identified, and it is unknown if the initial shooter was the man who said something to Castillo through the car window.

¶15 Sergeant Lombardi—working as a supervisor for the lower downtown area that evening—heard shots and moved toward the action. Sergeant Lombardi testified he came around a parked car to the right of Castillo, when he saw Castillo, then on foot, backing up, racking a shotgun (inserting a round into the chamber of the gun by pulling the pump handle back and pushing it forward), and aiming toward 19th Street. Sergeant Lombardi described seeing Castillo with another male, Castillo's cousin: "They both have their focus attention in [sic] where the shotgun's pointing, and they're both looking to where that fight and that altercation was, northbound towards 19th Street." Sergeant Lombardi stated, "I was fearing that he was trying to kill somebody, and out of defense of those people I fired one to two rounds at the suspect."

¶16 The defense called Sergeant Lombardi as a witness and discussed the order of events in this hectic scene. Sergeant Lombardi testified that he was the first officer to

responded: "I heard gunshots." The People later, seemingly referring to Castillo getting out of the car, asked: "How long after that did you hear the gunshots?" Strong responded: "Right after." On cross-examination, when asking about the timing of the gunshots defense counsel asked: "But it was immediate when he got out of that car, bam, you heard gunshots?" Strong responded: "Yes."

5

reach the spot from which he and Officer Simmons would eventually shoot. Defense counsel asked Sergeant Lombardi, "[Y]ou fired two rapid shots at Mr. Castillo before he fired at you?" Sergeant Lombardi responded, "Yes." Sergeant Lombardi said he was the first officer to shoot at Castillo and that after he shot at Castillo, Castillo turned, racked his gun, and shot back.

¶17 Castillo testified at trial that while he was firing toward 19th Street, he heard a bang and saw a muzzle flash to his right that looked similar to the other muzzle blasts he had seen coming from the initial shooter. Castillo testified he didn't see anyone, didn't hear anyone say anything, and thought the blast must have come from other people associated with the initial shooter.

¶18 Sergeant Lombardi testified that Officer Simmons arrived at the scene at some point after him. Officer Simmons testified he had been following Sergeant Lombardi, ten to twelve feet behind him. He arrived at Sergeant Lombardi's location and he stepped even with Sergeant Lombardi and saw Castillo holding the shotgun. Then, in Officer Simmons's words, "As he turned and faced us, that's when the first round was fired in our direction." After Officer Simmons felt something near his head and "felt something across [his] stomach like something had grazed [him]," he fired at Castillo. Officer Simmons testified that he believed that he fired around the same time as Sergeant Lombardi, but could not tell how many times Sergeant Lombardi shot.

¶19 Castillo was hit by police fire. Castillo then handed his gun to his cousin. Police shot and killed the cousin.

¶20 The officers were dressed in uniform, which consisted of a dark blue shirt with a badge, dark blue pants, and no reflective vest. Officer Simmons and Sergeant Lombardi testified that they did not give any commands or identify themselves as police. However, several witnesses testified they could tell the two were police officers. The parking lot was lighted, but how visible the police should have been to Castillo under the circumstances was disputed at trial.

¶21 By all accounts, the foregoing events occurred in a matter of seconds. Sergeant Lombardi testified it was approximately eleven seconds from the time he heard the first shots until he began shooting. Officer Simmons estimated the total event, from the sound of the first shots until the cousin fell to the ground, lasted ten to twenty seconds.

¶22 The prosecution charged Castillo with two counts of attempted first degree murder (as to Officer Simmons and Sergeant Lombardi), two counts of first degree assault on a peace officer (also as to Officer Simmons and Sergeant Lombardi), and five counts of second degree assault (as to bystanders present in the parking lot).

¶23 At trial, Castillo admitted that he shot at the police officers, but testified that he did not know they were police officers; he believed the people who turned out to be police were with the unidentified initial shooter.

¶24 Castillo's sole defense at trial was self-defense.

¶25 The trial court instructed the jury on self-defense; over defense counsel's objection, the court also instructed the jury regarding the provocation and initial aggressor exceptions to self-defense. The instructions read as follows:

7

(1) It is an affirmative defense to the crimes of Criminal Attempt to Commit Murder in the First Degree, Criminal Attempt to Commit Murder in the Second Degree, Assault in the First Degree, and Assault in the Second Degree that the defendant used physical force upon another person:

(A) in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force, and
(B) he used a degree of force which he reasonably believed to be necessary for that purpose.

Defendant was not required to retreat in order to claim the right to employ force in his own defense.

(2) It is not an affirmative defense that the defendant used physical force upon another person as set out in paragraph (1) of this Instruction if the defendant was the initial aggressor unless:

(A) the defendant withdrew from the encounter, and
(B) effectively communicated to the other person his intent to do so, and
(C) the other person nevertheless continued or threatened the use of unlawful physical force.

(3) It is not an affirmative defense that the defendant used physical force upon another person as set out in paragraph (1) of this instruction if the defendant, with intent to cause bodily injury or death to another person, provoked the use of unlawful physical force by that person.

(4) Self defense as described above is not an affirmative defense to the crime of Criminal Attempt to Commit Reckless Manslaughter and Assault in the Third Degree. However, in determining whether the defendant acted recklessly as required in Criminal Attempt to Commit Reckless Manslaughter as defined in Instruction No. 13, or in a criminally negligent manner as required in Assault in the Third Degree as defined in Instruction No. 18, you may consider evidence that the defendant acted in self-defense or in defense of others.

8

¶26 In response to Castillo's objection to the provocation and initial aggressor instructions, the trial court reasoned that Castillo's racking of the gun before the police fired warranted instructing the jury on these exceptions to self-defense:

> The Court would find that there is a question of fact for the jury to determine whether the defendant was the initial aggressor or provoked the alleged victim to shoot him. The Court would find that the jury could find that—based on the timing that they could find that the defendant in racking his gun was the first significant event involving the defendant and the alleged victim and that this is more than words or insult. The Court would find that this would be sufficient to submit the issue of provocation and initial aggressor to the jury.

(Emphasis added.)

¶27 The jury found Castillo guilty of two counts of attempted second degree murder (as to Officer Simmons and Sergeant Lombardi), and one count of second degree assault (as to one of the bystanders). But the jury acquitted Castillo on two counts of first degree assault on a peace officer (as to Officer Simmons and Sergeant Lombardi). The trial court dismissed the remaining counts of second degree assault, two on motion by the prosecution. Castillo's counsel argues that the acquittal on the first degree assault count suggests the jury at least harbored a reasonable doubt as to whether Castillo knew Sergeant Lombardi and Officer Simmons were peace officers. The People counter that the jury might simply have rejected the notion that Castillo had the specific intent necessary for first degree assault and attempted first degree murder.

¶28 The trial court sentenced Castillo to fourteen years on each count of attempted second degree murder and five years on the second degree assault charge, each to run consecutively, for a total of thirty-three years in prison.

9

¶29 Castillo appealed. As relevant here, Castillo argued the trial court erred in instructing the jury on the initial aggressor and provocation exceptions to self-defense. A division of the court of appeals affirmed. As to the provocation instruction, the division concluded that the trial court erred in giving the instruction because there was no evidence presented "that defendant's words or actions were intended to provoke the handgun shooter into attacking first in order to provide a pretext for defendant to use physical force." People v. Castillo, 2014 COA 140M, ¶ 25, __ P.3d __. The division also found there was "no evidence that defendant intended to provoke the police into shooting at him so that he could shoot back." Id. However, it concluded that the error was harmless because there was "no reasonable probability that including the provocation exception to self-defense in the instruction misled the jury or otherwise contributed to the defendant's conviction." Id. at ¶ 34.

¶30 As to the initial aggressor instruction, the division rejected the trial court's finding that Castillo's racking of his gun was evidence of Castillo acting as an initial aggressor. Instead, it determined that Castillo's firing at the police could not be viewed as a separate incident. However, the division concluded, on other grounds, it was not error to give the instruction. Calling it a "very close question," the division reasoned as follows:

> [O]ne person in defendant's car [(Strong)] testified, at least on direct examination, that she heard gunshots after defendant got out of the car and thus also after he popped open the trunk (although on cross-examination, she stated she heard gunshots when defendant got out of the car). This witness testified that after she heard defendant exchange words with the other man (who may or may not have been the [initial]

10

shooter), defendant put the car in park, got out, and started cursing at the other man. She then heard gunshots.

The People also emphasize that another of defendant's companions allegedly told the police during her initial interview that defendant got out of the car after somebody said something to defendant "that got him mad," a statement which was admitted as an inconsistent statement (and thus substantive evidence pursuant to section 16-10-201, C.R.S. 2014) because the witness testified at trial that she heard shooting before defendant got out of the car.

Id. at ¶¶ 18–19.

¶31    Castillo petitioned this court for review. We granted certiorari.[2]

## II. Standard of Review

¶32    Whether sufficient evidence exists to support the requested instruction is a question of law that we review de novo. O'Shaughnessy v. People, 2012 CO 9, ¶ 13, 269 P.3d 1233, 1236.

## III. Analysis

¶33    We begin with an overview of the prosecution's burden in seeking an initial aggressor instruction. We then turn to whether the division erred in concluding that the trial court was right to instruct the jury on the initial aggressor exception to

---

[2] We granted certiorari to review the following issues:

1. Whether the court of appeals erred in finding that erroneously instructing the jury on the provocation exception to self-defense was harmless error where the exception was unsupported by the evidence and where, in closing, the prosecutor asked the jury to apply the exception by misstating the evidence.

2. Whether the court of appeals erred by holding that the trial court did not err by instructing the jury on the initial aggressor exception to self-defense.

self-defense. We first define what constitutes an initial aggressor and then apply that definition to this case. We conclude that the division was wrong to affirm the trial court's decision to give the initial aggressor instruction. We also conclude that the error was not harmless, particularly given the prosecution's extensive reliance on the initial aggressor instruction during closing argument. Because Castillo is entitled to a new trial based on the initial aggressor instruction, we need not, and thus do not, reach whether the provocation jury instruction constituted harmless error.

## A. Prosecution's Burden in Seeking an Initial Aggressor Instruction

¶34 The trial court has a duty to correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions. Cassels v. People, 92 P.3d 951, 955 (Colo. 2004). The trial court "should not instruct on abstract principles of law unrelated to the issues in controversy, nor . . . on doctrines or principles which are based upon fanciful interpretations of the facts unsupported by the record." People v. Alexander, 663 P.2d 1024, 1032 (Colo. 1983) (citations omitted). A trial court must decide whether there is sufficient evidence to warrant a jury instruction related to an affirmative defense and any exceptions to such affirmative defense. See O'Shaughnessy, ¶ 13, 269 P.3d at 1236.

¶35 While we have written many times about the defendant's burden in seeking instruction on an affirmative defense,[3] we have not addressed the burden the

_____

[3] Section 18-1-407(1), C.R.S. (2017), states that to raise an affirmative defense the defendant must present "some credible evidence" that the defense applies (unless the

12

prosecution must shoulder in seeking instruction on an exception to an affirmative defense.

¶36    Unsurprisingly, the parties disagree about what this standard should be. The division below held that the trial court should instruct the jury on an exception to an asserted affirmative defense if "some evidence supports the exception," describing the standard as a "minimal showing." Castillo, ¶¶ 20–21. The People argue that the standard should be "any evidence," because we should want to give the jury more law, not less. Castillo argues that the standard to present a jury instruction for an exception to an affirmative defense should be higher than the standard to present a jury instruction for an affirmative defense, reasoning the prosecution's standard should be tied to the sufficiency-of-the-evidence standard.

---

state's evidence raises the issue involving the alleged defense). We have articulated this standard in slightly different ways over time. See, e.g., O'Shaughnessy, ¶ 12, 269 P.3d at 1236 ("The 'some credible evidence' standard requires little evidence for submitting an affirmative defense to the jury." (emphasis added)); People v. Speer, 255 P.3d 1115, 1119 (Colo. 2011) ("It is too well settled to merit further discussion that a trial court is obliged to instruct the jury on a requested affirmative defense if there is any credible evidence, including even highly improbable testimony of the defendant himself, supporting it." (emphasis added)); People v. Saavedra-Rodriguez, 971 P.2d 223, 228 (Colo. 1998) ("'Some credible evidence,' an alternative statement of the 'scintilla of evidence' standard, is necessary to present an affirmative defense." (emphasis added)); Idrogo v. People, 818 P.2d 752, 754 (Colo. 1991) ("We have consistently held that where the record contains any evidence tending to establish the defense of self-defense, the defendant is entitled to have the jury properly instructed with respect to that defense." (emphasis added)).

13

¶37    We assume without deciding that the division applied the correct standard when it said there must be "some evidence" of the initial aggressor exception.[4]  We do not answer this question because it was error to give the initial aggressor exception under any standard.

## B.  The Initial Aggressor Exception

¶38    To understand the initial aggressor exception, we begin by outlining the law governing self-defense.    For certain crimes that require intent, knowledge, or willfulness, self-defense may be raised as an affirmative defense.[5]    See Roberts v. People, 2017 CO 76, ¶¶ 24–28, 399 P.3d 702, 705–06.  As relevant here, self-defense may justify the use of force in the following circumstances:

> (1) Except as provided in subsections (2) and (3) of this section, a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he

---

[4] We note that there are strong arguments that the burden of proof to raise an exception to an affirmative defense should be higher than the burden to raise an affirmative defense, given the prosecutor's ultimate burden to prove an exception to an affirmative defense beyond a reasonable doubt.  In contrast, if the prosecution relies on an exception to disprove an affirmative defense, the defendant need only raise a reasonable doubt as to the existence of that exception.  Some jurisdictions, like Texas, where the prosecution bears the burden to disprove an affirmative defense beyond a reasonable doubt, tie the jury-instruction standard to raise an exception to the sufficiency-of-the-evidence standard.  See Smith v. State, 965 S.W.2d 509, 514 (Tex. Crim. App. 1998) ("An instruction on provocation should only be given when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt.").  However, we save this question for another day.

[5] For crimes requiring recklessness, criminal negligence, or extreme indifference, self-defense is not an affirmative defense, but rather is a traverse designed to negate the mens rea element.  People v. Pickering, 276 P.3d 553, 556 (Colo. 2011); see also § 18-1-704(4), C.R.S. (2017).

14

may use a degree of force which he reasonably believes to be necessary for that purpose.

(2) Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and:

(a) The actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury . . . .

§ 18-1-704(1)–(2), C.R.S. (2017). The touchstone of self-defense is "reasonable belief rather than absolute certainty," which can include a defendant's use of self-defense based on "apparent necessity." Beckett v. People, 800 P.2d 74, 78 (Colo. 1990).

¶39 When self-defense is an affirmative defense, the defendant generally admits the commission of the elements of the charged act, but seeks to justify the act. People v. Pickering, 276 P.3d 553, 555 (Colo. 2011). Disproving the existence of self-defense becomes an additional element of the offense that the prosecution has to disprove beyond a reasonable doubt. § 18-1-407; see also Pickering, 276 P.3d at 556.

¶40 One way for the prosecution to defeat a claim of self-defense is to prove beyond a reasonable doubt that an exception to self-defense applies. One such exception arises when the defendant was the initial aggressor:

(3) Notwithstanding the provisions of subsection (1) of this section, a person is not justified in using physical force if:

. . . .

(b) He is the initial aggressor; except that his use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force . . . .

§ 18-1-704(3), C.R.S. (2017).

¶41 The division defined initial aggressor as the person who "initiated the physical conflict by using or threatening the imminent use of unlawful physical force." Castillo, ¶ 14 (citing People v. Griffin, 224 P.3d 292, 300 (Colo. App. 2009)). The division in Griffin gleaned this language from a passing reference to the phrase "initial aggressor" in our opinion, People v. Jones, 675 P.2d 9, 16 (Colo. 1984) ("The Colorado law of self-defense requires that there be some evidence showing that the victim, as the initial aggressor, used or threatened the imminent use of unlawful physical force against the defendant."). We find this definition of initial aggressor appropriate. Because we have not yet defined "initial aggressor" in this context, we explain our reasoning.

¶42 In construing a statute, we seek to give effect to the General Assembly's intent by according words and phrases their plain and ordinary meanings. State Farm Mut. Auto. Ins. Co. v. Fisher, 2018 CO 39, ¶ 12, __ P.3d __. When interpreting the General Assembly's intent, we turn first to the language of the statute. Klinger v. Adams Cty. Sch. Dist. No. 50, 130 P.3d 1027, 1031 (Colo. 2006). Statutory definitions of words used elsewhere in the same statute furnish authoritative evidence of legislative intent. Farmers Ins. Exch. v. Bill Boom Inc., 961 P.2d 465, 470 (Colo. 1998).

¶43 We find the division's definition appropriate because it mirrors language from section 18-1-704(3)(b) stating how the original non-aggressor becomes the aggressor. Section 18-1-704(3)(b) outlines how an initial aggressor can regain the right to self-defense, which we have described as when the original non-aggressor "becomes the aggressor." People v. Garcia, 28 P.3d 340, 347 (Colo. 2001). After an initial aggressor

16

effectively withdraws from an encounter, the original non-aggressor becomes the aggressor when the original non-aggressor "continues or threatens the use of unlawful physical force." § 18-1-704(3)(b). In explaining how an original non-aggressor becomes an aggressor, the General Assembly indicated its view of what actions make someone an "aggressor." Defining the initial aggressor as the person who "initiated the physical conflict by using or threatening the imminent use of unlawful physical force" appropriately embodies the aforementioned meaning of "aggressor" and modifies it to encompass the word "initial."[6]

¶44 The question not answered by this definition, and where the parties disagree, is what constitutes a "threat" under section 18-1-704(3)(b). The parties and most divisions of the court of appeals that have addressed the issue agree that insults alone do not make someone an initial aggressor. See, e.g, People v. Silva, 987 P.2d 909, 916 (Colo. App. 1999) ("That [the defendant] may have uttered some insult or engaged in an argument also would not justify identifying defendant as the initial aggressor."); People v. Manzanares, 942 P.2d 1235, 1241 (Colo. App. 1996) (same); People v. Beasley, 778 P.2d 304, 306 (Colo. App. 1989) ("Although defendant may have participated in the exchange of insults between the cars, insults alone do not make one the initial aggressor."). And

---

[6] The parties appear to agree to this language generally. See Castillo's Opening Br. 37, Castillo's Reply Br. 32 (defining "initial aggressor" as the person who "initiated the physical conflict," but also stating "[t]he 'initial aggressor' is the person who, by a physically threatening action that is beyond mere insulting words, initiates the conflict"); see also People's Answer Br. 14 (citing to the aforementioned Jones and Griffin definitions).

the parties do not seem to dispute that a physically threatening action would make someone an initial aggressor. See Castillo's Reply Br. 32.

¶45 Where the parties diverge is as to whether an oral threat alone can be sufficient to warrant an initial aggressor jury instruction. Castillo draws from the precedent regarding insults alone being insufficient that oral threats also would be insufficient. Cf. People v. Zukowski, 260 P.3d 339, 347 (Colo. App. 2010) ("A defendant must initiate the physical conflict to be the initial aggressor."); People v. Roadcap, 78 P.3d 1108, 1113 (Colo. App. 2003) (same). The People, relying in part on the dictionary definition of "aggressor," as "one that commits or practices aggression," argue that while insults alone are insufficient to make one an initial aggressor, oral threats can be sufficient. We do not find it necessary to answer this question today because, as we describe below, there was no evidence presented that Castillo threatened the initial shooter.

### C. Lack of Evidence Supporting Initial Aggressor Jury Instruction

¶46 The trial court gave the jury instruction for initial aggressor, reasoning that the jury could view Castillo's racking of the gun before the police fired as the "first significant event involving the defendant and the alleged victim and that this is more than words or insult."

¶47 The division of the court of appeals rejected this reasoning because it found that the events giving rise to this criminal action cannot be broken into two separate

18

incidents. We agree with the division that this case involves one continuous episode.[7] Based on the testimony, the events at issue happened in much less than a minute. According to the two officers who fired shots at Castillo, only seconds elapsed between the moment when they heard gunfire by the initial shooter and the moment when they engaged Castillo. Sergeant Lombardi testified approximately eleven seconds passed from the time he heard the first shots until he began shooting. Officer Simmons estimated the total event, from the sound of the first shot until Castillo's cousin fell to the ground, lasted ten to twenty seconds.

¶48    We have before defined "same incident" for crimes of violence as "an occurrence considered to be a single, rather than more than one, happening or unit of experience." Marquez v. People, 2013 CO 58, ¶ 9, 311 P.3d 265, 268. We find that definition instructive here. The short timeframe, a matter of seconds, with no break in the action, indicates that this was one happening or one unit of experience.

---

[7] Even if this seconds-long, continuous episode could be parsed into two incidents and the pertinent question was whether Castillo initiated aggression against the police officers during the "second" incident, there's simply no evidence that Castillo directed his weapon towards the police officers before at least one of them fired on him. Sergeant Lombardi, who arrived first to the spot from which he and Officer Simmons would eventually shoot, testified he was the first officer to shoot and he shot at Castillo while Castillo was facing toward the location of the initial shooter in the direction of 19th Street. According to Sergeant Lombardi, Castillo was racking and pointing his shotgun toward 19th Street when he shot at Castillo. Both Sergeant Lombardi and Officer Simmons testified Officer Simmons arrived at the scene after Sergeant Lombardi. And Sergeant Lombardi repeatedly testified that he fired at Castillo before Castillo fired at him and Officer Simmons. In making these observations about the record, we do not mean to disparage these police officers or question their actions. Nor do we address whether Castillo's actions were reasonable. We only examine whether there was evidence that Castillo was the initial aggressor. There was none.

¶49 So, the question becomes whether Castillo was the initial aggressor as to the entire episode.

¶50 The prosecution points to various aspects of the evidence it believes supports the initial aggressor instruction: (1) Castillo spoke with the unknown person through the car window and one person testified that Castillo cursed at him; (2) according to one witness (at least on direct), Castillo popped the trunk and got out of his car before the shooting began; and (3) Castillo testified that he did not threaten the unidentified man who spoke to him through the window, but the jury could reasonably infer the opposite, in conjunction with other evidence.

¶51 None of this evidence suggests Castillo initiated the physical conflict by using unlawful physical force. So, does it suggest Castillo initiated the physical conflict by threatening the imminent use of unlawful physical force?

¶52 We first consider the interaction between Castillo and the unidentified man who said something as he walked past Castillo's car, who may or may not have been the same person as the initial shooter. As described above, the People ask us to hold today that while insults alone cannot make one the initial aggressor, see Beasley, 778 P.2d at 306, threats can. However, there is no evidence that Castillo threatened the man (again, who might not have been the initial shooter in any event). No one testified that Castillo threatened the man though the window, and Castillo testified that he did not threaten the man. Viewing the evidence in the light most favorable to the prosecution, Castillo cursed at the man through the window. The People acknowledge, and we accept, that insults are insufficient to render Castillo the initial aggressor.

20

¶53    What about Castillo popping his trunk and getting out of his car?  Viewing the evidence in the light most favorable to the prosecution, Castillo cursed at the man, popped his trunk, and then got out of his car.  Is that sufficient evidence that Castillo threatened the imminent use of unlawful physical force?  We conclude it is not.  Even viewing all the evidence in the light most favorable to the prosecution, popping the trunk and getting out of the car is, at most, an aggressive step.  But we cannot say that doing so threatens the imminent use of unlawful physical force.

¶54    Thus, we find the division of the court of appeals erred in affirming the trial court's decision to instruct the jury regarding initial aggressor.

### D.  Harmless Error

¶55    Because the division found the trial court did not err in giving the initial aggressor jury instruction, the division did not reach harmlessness.  Because we conclude there was error, we now address whether that error was harmless.

### 1.  Applicable Law

¶56    We review nonconstitutional trial errors that were preserved by objection for harmless error.  Hagos v. People, 2012 CO 63, ¶ 12, 288 P.3d 116, 119.

¶57    "Under this standard, reversal is required only if the error affects the substantial rights of the parties.  That is, we reverse if the error substantially influenced the verdict or affected the fairness of the trial proceedings."  Id. (internal quotation marks and citations omitted).

¶58    In Harris v. People, we held that giving an instruction on a limitation of the right to self-defense when the evidence did not warrant such an instruction "must inevitably

21

have misled the jury, and induced them to think that the defendant's conduct, even if his own testimony was true, was to be measured by the rule thus laid down." 75 P. 427, 430 (Colo. 1904). The Harris court explained that giving the additional instruction "must nevertheless have led the jury to believe that the court would not have stated the doctrine, had it not been applicable to the case," even though the court did not try to apply the doctrine to the facts. Id. The Harris court concluded injury from the additional instruction "probably did result." Id.

¶59 Since that early case, we have repeatedly expressed concern that jurors might try to fit facts into an erroneously given instruction. See, e.g., Barnhisel v. People, 347 P.2d 915, 917 (Colo. 1959) (describing how an instruction, which correctly states the law but is not supported by evidence, erroneously "implies or assumes the existence of evidence not in the record"); Tate v. People, 247 P.2d 665, 672 (Colo. 1952) ("The fact that the trial court gave an instruction on first degree murder when the essential elements are missing in the proof, it must be said that the jury could easily infer by the giving of such an instruction that these elements were present in the case.").

¶60 And we have recognized that errors regarding jury instructions can be "exacerbated by the prosecution's misleading comments during its closing argument." Garcia, 28 P.3d at 346 (holding that under the plain error standard, the defendant was entitled to reversal because "the trial court's instructional errors, coupled with the prosecution's misleading comments, could have prevented the jury from considering the issue of provocation after finding Defendant guilty of second-degree murder"); see also People v. Toler, 9 P.3d 341, 354 (Colo. 2000) (holding that the prosecutor, "[f]urther

22

complicating the situation," emphasized the error in the instruction, which "may have had the effect of focusing the jury on the erroneous portion of the self-defense instruction").

¶61 So, superfluous instructions limiting self-defense may be prejudicial; and contrary to the People's reading, People v. Dunaway, 88 P.3d 619 (Colo. 2004), doesn't hold otherwise. While Dunaway stands for the idea that jurors are well equipped to analyze evidence, id. at 629, we decline to read Dunaway to stand for the proposition that there can never be prejudice when a superfluous jury instruction is given. In fact, in Kaufman v. People, a case decided after Dunaway, we reaffirmed the notion that there can be prejudice from unsupported instructions because the jury is likely to try to fit facts into an erroneously given instruction. 202 P.3d 542, 562 (Colo. 2009) ("During deliberations, it is possible that the jury may have wondered why it was given the instruction, decided that it must have been for some purpose, and forced the evidence to fit the instruction, thereby denying Kaufman his claim to self-defense.").

## 2. Application

¶62 Even if giving an improper instruction yields only the possibility of prejudice, the prosecution's extensive reliance on the initial aggressor exception instruction here transformed that possibility into something that substantially influenced the verdict or, at the very least, affected the fairness of the trial proceedings.

¶63 Not only did the trial court give the superfluous initial aggressor instruction, but the prosecutor relied heavily on it during closing:

23

- "If you don't believe that the defendant was the initial aggressor, the first person to start it, disregard the initial aggressor law, okay? If you don't think he started it, then don't worry about initial aggressor. For the same reason, if you don't think that the defendant, when he walked into the crowd and racked that gun, provoked a response by an unknown gun, disregard provocation. So it's kind of up to you to mix and match the law as it relates to the facts that you determine."

- "The law on initial aggressor is that self-defense doesn't apply if you started it. You can't pick a fight with someone physically and then claim self-defense because, you know, he hit me back. That's kind of a basic common sense thing but it's also the law . . . ."

- "So self-defense isn't available to someone who started it unless those three things apply. Did the defendant start this? What did he start? Did he start the fight in the parking lot, the gunfire in the parking lot between some unknown gunmen and a shotgun? Did that end and then he started another fight with the officers? That's up to you to decide. And if he started it, the defendant can't assert self-defense. It doesn't apply."

¶64 Compounding the confusion regarding the initial aggressor exception, the prosecution also stated the jury could view the incident as two incidents:

- "And he was the initial aggressor with the officers. As he's backing up and he's racking that shotgun 10 feet away from these cops, you bet he's the initial aggressor. You bet. And they had no choice but to put him down."[8]

---

[8] The prosecutor exacerbated the potential for prejudice by insinuating the existence of facts to fit the exception:

He goes to the back of the trunk and, again, this is for you guys to determine. But it sounds like the 9 millimeter went off first. Did it go off in response to the defendant going into his trunk and pulling this out? Again, that's for you to decide.

(Emphasis added.) There was no evidence presented at trial that the shots were fired after Castillo went to his trunk and pulled out the gun. And "inferences may be drawn

24

¶65 And in fact, we know the jury did grapple with the jury instructions regarding exceptions to self-defense because the jury asked a question related to provocation: "Can words be considered 'provocation' under Instruction 20(3)?" The trial court responded: "Words alone are not sufficient to constitute provocation or make a person an initial aggressor." The jury's question indicates the jury was closely considering at least the provocation exception.

¶66 Given the superfluous jury instruction and the statements by the prosecution, we conclude that the trial court's erroneous decision to give the initial aggressor jury instruction substantially influenced the verdict or affected the fairness of the trial proceedings. Thus, we reverse the judgment of the division of the court of appeals and remand for a new trial.

¶67 We also granted review to decide whether it was harmless error for the trial court to instruct the jury on the provocation exception. Because we hold a new trial is warranted on the initial aggressor error, we need not, and thus do not, reach any issues regarding provocation.

## IV. Conclusion

¶68 The trial court erred in giving the initial aggressor instruction. The error was not harmless. Castillo is entitled to a new trial. We remand for further proceedings consistent with this opinion.

**JUSTICE COATS** dissents, and **JUSTICE BOATRIGHT** joins in the dissent.

---

only from the facts in evidence and [m]ay not be based on mere speculation or conjecture." People in Interest of R.D.S., 514 P.2d 772, 775 (Colo. 1973).

JUSTICE COATS, dissenting.

¶69 With its opinion today, the majority overturns the defendant's convictions for attempting to murder two Denver police officers and assaulting a bystander, in a melee in which the defendant concededly fired a shotgun at both the bystanders and the police, endangering at least one of the bystanders and grazing one of the officers, before he was himself wounded and his cousin killed by police fire; and it explains that it does so for the reason that the trial court erred in allowing the jury to hear the full, statutory definition of self-defense. The majority reasons that despite substantially conflicting accounts of the melee, in the crowded parking lot of a club at closing time, involving multiple shots by the police in the wake of shooting by the defendant and at least one other man, all in a matter of seconds, there was no credible evidence from which the jury could have found that the defendant was the initial aggressor in his exchange of gunfire with the police. Because I disagree with the majority's understanding of the law of self-defense in this jurisdiction, as well as a trial court's duty to ensure that the jury is accurately instructed concerning that law, and because I believe today's holding will have a substantially deleterious impact on courts attempting to satisfy that duty, I respectfully dissent.

¶70 To be perfectly clear, there is no suggestion in the majority opinion (nor could there be) that the jury instructions in any way mischaracterized the law of self-defense or relieved the prosecution of its burden to prove that the defendant's conduct in firing on the police was not legally justified in defense of himself or a third person. In this

1

jurisdiction, one is legally justified in using against another person a degree of physical force, other than deadly physical force, that he reasonably believes to be necessary to defend himself or a third person from what he also reasonably believes to be the use or imminent use of unlawful physical force by that other person, unless he provokes the unlawful physical force with the intent to cause bodily injury or death to the other person or the force involved is the product of an unauthorized combat by agreement. § 18-1-704, C.R.S. (2017). Unlike a number of other jurisdictions, in this jurisdiction he may also do so without first retreating unless he was the initial aggressor, in which case he may only do so if he first withdraws from the encounter and effectively communicates to the other person his intent to do so, but the other person nevertheless continues to use or threaten the use of unlawful physical force. See COLJI-Crim. H:11 (2017); COLJI-Crim. H:11 cmt. 3. The majority reverses simply on the grounds that the jury should never have heard of this qualification on the right to defend without first retreating (which the majority characterizes as an "exception" to the defense but which I would find integral to the definition of the defense itself) because no reasonable juror could have believed that the defendant was the initial aggressor in this scenario.

¶71 Especially in a hardly atypical scenario like this, in which multiple parties are involved in a quickly developing, confusing, and deadly melee, I believe the jurors should virtually always be fully instructed on the law governing justification and be permitted to decide for themselves the precise sequence of events and assess as a factual matter the perceptions and motivations of the parties involved. In this case, one of the

2

officers, for shooting at whom the defendant was convicted of attempted murder, actually testified that he returned fire only after being grazed by the defendant's first shotgun blast. Apparently treating both officers as a single person, the majority interprets the testimony at trial as precluding any finding that the defendant was the initial aggressor as to either officer. See maj. op. at ¶ 47 n.7. While I believe such a restrictive interpretation of the evidence usurps the role of the jury, especially on the evidence in this case, the majority's conclusion that the defendant could not have been found the initial aggressor in this scenario does not rest primarily on its understanding of the interactions between the defendant and the officers but rather its understanding of what it means to be an "initial aggressor" within the contemplation of the statute.

¶72 While I consider the reversal of both of the defendant's attempted murder convictions to be problematic enough, I believe the really substantial and long-lasting damage of today's holding lies in its interpretation of the statutory term "initial aggressor" as referring to the defendant's role in the broader episode or transaction, rather than his conduct toward the person against whose attack with unlawful force he purports to be defending. Regardless of any threatening behavior toward the police, the majority finds it error to instruct concerning the obligations of an initial aggressor in using physical force against them, on the grounds that there was insufficient evidence that the defendant was the initial aggressor vis-à-vis the third party with whom he was exchanging gunfire when the police arrived. The majority therefore occupies itself largely with the questions whether the entire melee constituted a single episode or

3

incident and who started the fight between the defendant and the third person with whom he was exchanging gunfire.

¶73 While a reasonable but mistaken belief that the party against whom he exercises physical force is allied with and assisting someone from whom he is already under unlawful attack might, under some set of circumstances, be relevant to a defendant's justification for using that force, the majority's holding that his obligation to retreat or withdraw before responding is contingent upon evidence that he was the initial aggressor against a third person, merely because his use of force against both victims could be described as part of a single "episode," lacks support in either logic or the language of the statute. Although the question whether different acts are part of a single episode, or incident, has statutory significance and has long bedeviled us in the context of charging, multiple convictions, and sentencing, see § 18-1-408, C.R.S. (2017); see also In re Greene, 2013 CO 29, ¶¶ 12–13, 302 P.3d 690, 694, we have never suggested that the concept of an "episode" has significance for purposes of self-defense in general, or "initial aggressor" in particular. The statute does not allude to this concept in any way and, in fact, clearly uses the term in reference to the person upon whom the defendant has applied physical force and to whom he is obligated to effectively communicate his intent to withdraw from the encounter. With regard to the defendant's shotgun blasts at the police, the pertinent question should be whether he initiated an aggression against them—not whether he initiated the exchange of gunfire with an unidentified third person before the police arrived.

4

¶74 As I believe the majority's carefully parsed rationalization demonstrates, questions concerning justification for using physical force in defense of one's person generally entail difficult factual determinations about the perceptions of the respective parties at every critical point in time and the reasonableness of those perceptions. Especially when multiple parties are involved, the trier of fact is tasked with determining the reasonableness of perceptions concerning not only who is under attack or imminent attack from whom but also who is allied with and assisting whom. Unlike the majority, I am disinclined, through strained construction or otherwise, to restrict the jury's role in weighing justification for the use of force, by depriving it of full knowledge of the controlling principles of self-defense.

¶75 I therefore respectfully dissent.

I am authorized to state that JUSTICE BOATRIGHT joins in this dissent.