22CA1702 Peo v McCoy 10-17-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1702
City and County of Denver District Court No. 21CR3206
Honorable Jay S. Grant, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Weldon B. McCoy,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE BROWN
Welling and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 17, 2024

Philip J. Weiser, Attorney General, Jessica E. Ross, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Christopher Smallwood, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Weldon B. McCoy, appeals the judgment of conviction entered upon a jury verdict finding him guilty of third degree assault. On appeal, McCoy contends that the district court made two evidentiary errors and allowed the prosecutor to commit misconduct. McCoy also contends that the cumulative effect of these errors requires reversal. We address and reject each contention and affirm the judgment.

I.    Background

¶ 2    On the night of May 15, 2021, friends John Russell, Brayden Hallet, and Alex Barnes went out drinking in downtown Denver. While sitting outside at a bar, they began to laugh at an unhoused man on the street. McCoy noticed the friends laughing at the man and asked Barnes if he found homelessness "funny or amusing." McCoy and Barnes got into a heated argument, and then McCoy struck Barnes with his fist and grabbed him.

¶ 3    Barnes never struck back, but Russell intervened by repeatedly punching McCoy. McCoy pulled out a window-breaking tool "to firm up [his] fists" and punched Russell in his side. Russell "fell feeble," and the physical altercation ended. While video surveillance partially captured the sequence of events, what led to

the altercation — including who made what threats — remained in dispute at trial.

¶ 4     The People charged McCoy with one count of third degree assault against Barnes and one count of first degree assault against Russell. After a two-day trial, a jury convicted McCoy of the third degree assault of Barnes but acquitted him of the first degree assault of Russell. The district court sentenced McCoy to eighteen months of probation.

## II.     Evidentiary Errors

¶ 5     McCoy contends that the district court erred by (1) prohibiting a witness from testifying about McCoy's character for truthfulness and (2) allowing the prosecutor to improperly impeach a witness.

## A.     Standard of Review

¶ 6     We review a trial court's determination regarding the admissibility of evidence for an abuse of discretion. *People v. Lane*, 2014 COA 48, ¶ 21. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or is based on an erroneous understanding or application of the law. *People v. Esparza-Treto*, 282 P.3d 471, 480 (Colo. App. 2011).

## B.    Character Evidence

¶ 7    McCoy contends that the district court erred by prohibiting him from presenting witness testimony pertaining to his character for truthfulness after permitting the prosecutor to attack his credibility in a "slashing" cross-examination.  We disagree.

### 1.    Applicable Law

¶ 8    In general, evidence of a person's character may not be admitted to show that the person acted in conformity therewith on a particular occasion.  CRE 404(a); *People v. Goldfuss*, 98 P.3d 935, 937 (Colo. App. 2004).  If a defendant in a criminal prosecution wishes to offer evidence of their truthful character, however, they may do so under CRE 608(a), but only after the prosecution first attacks their character for truthfulness.  *People v. Serra*, 2015 COA 130, ¶ 62; *see also People v. Miller*, 890 P.2d 84, 95 (Colo. 1995) ("[A] defendant does not have the right to introduce character evidence simply by virtue of the fact that the defendant takes the witness stand in [their] own defense at trial.").

¶ 9    "A person's character with respect to truthfulness means that person's propensity to tell the truth in all the varying situations of life" — in other words, their "general propensity to tell the truth."

*Serra*, ¶ 66 (quoting *State v. Colon*, 284 P.3d 589, 594 (Or. Ct. App. 2012)).  Questions that imply that a defendant's testimony is not credible do not necessarily attack the defendant's overall "character for truthfulness."  *Id.* at ¶¶ 65-66; *see also Miller*, 890 P.2d at 93 ("[T]he mere fact that a witness is contradicted by other evidence in the case does not constitute an attack upon his reputation for truth and veracity.") (citation omitted).

### 2. The District Court Did Not Abuse its Discretion by Excluding Testimony of McCoy's Character for Truthfulness

¶ 10    McCoy argues that the prosecutor's "slashing, lengthy, and contradicting" cross-examination had the net effect of attacking his character for truthfulness, such that he should have been allowed under CRE 608(a) to present a witness who would testify to his character for truthfulness.  To support his request to admit the character evidence at trial, McCoy highlighted five examples of questions he claimed attacked his truthful character.

- The prosecutor asked McCoy a series of questions, repeating the phrase "you don't remember," in reference to McCoy's inability to recall his whereabouts leading up to the incident.

4

- While discussing contradictions between the People's version of events and McCoy's testimony, the prosecutor probed McCoy, "Doesn't it make more sense what the People's witnesses testified to . . . ?"

- When referencing discrepancies between the video of the incident and McCoy's recounting, the prosecutor asked on two occasions, "[I]s it that [what you testified to] wasn't recorded or that it didn't happen?"

- Twice during the cross-examination, the prosecutor asked McCoy, "[Y]ou're asking the jury to believe that?"

- The prosecutor allegedly used a sarcastic tone when repeating McCoy's statements back to him, as if to call the credibility of the statements into question.

¶ 11    The district court disallowed the character witness' testimony, reasoning that there is a difference between questioning a person's truthfulness as to a particular event and arguing that the person has a dishonest character generally.

¶ 12    We perceive no error in the district court's decision to exclude evidence of McCoy's character for truthfulness.  True, the prosecutor asked tough, pointed questions that had the effect of

5

undermining McCoy's testimony as it related to the incident giving rise to the charges in the case — including about McCoy's lack of clarity regarding what he was doing before the incident and how his account was contradicted by the video evidence and witness testimony. But the prosecutor's questions, viewed individually or collectively, did not attack McCoy's "propensity to tell the truth in all varying situations of life." *Serra*, ¶ 66. Instead, the questions appropriately identified discrepancies between McCoy's testimony and the other admitted evidence and invited the jury to view McCoy's version of events with skepticism as a result. *See Miller*, 890 P.2d at 95 (whether a witness' character for truthfulness has been attacked depends on the circumstances of each case). Because the prosecutor's cross-examination of McCoy did not amount to an attack on his character, evidence that McCoy was a truthful person was not admissible. *See Serra*, ¶ 68. Thus, the district court did not abuse its discretion by precluding the evidence.

## C. Impeachment Evidence

¶ 13    McCoy next contends that the district court erred by permitting the prosecutor to impeach a witness with a prior

statement that did not contradict her live testimony. We discern no abuse of discretion.

### 1. Applicable Law

¶ 14 Under CRE 613, a witness may be impeached with a prior inconsistent statement. *Liscio v. Pinson*, 83 P.3d 1149, 1155 (Colo. App. 2003). Notably, the inconsistency between the prior statement and the witness' trial testimony need not amount to a patent contradiction; rather, the rule requires only "a material variance between the witness' testimony and the prior statement or at least the omission of a significant detail which it would have been natural to mention in the prior statement." *Williams v. Dist. Ct.*, 700 P.2d 549, 557 (Colo. 1985).

### 2. The District Court Did Not Abuse its Discretion by Allowing the Prosecution to Impeach the Witness

¶ 15 Evidence established that McCoy was "a regular" at the bar outside of which the altercation occurred. During the direct examination of an employee who worked the night of the incident, the prosecutor inquired about McCoy's interactions with other customers, asking, "[D]o your customers tend to get along with him, not get along with him?" The employee testified that, "for the

7

majority, [she] saw people getting along with him." In a statement the employee provided to the prosecution four months earlier, however, the employee had said that "some customers [take] offense to [McCoy]." Due to the perceived inconsistency between the two statements, the prosecutor impeached the witness with her prior statement. McCoy objected to the "improper impeachment," but the court overruled the objection.

¶ 16     McCoy argues that the prosecutor's impeachment was improper because stating that *most* people get along with McCoy is not inconsistent with stating *some* people take offense to him; rather, one is simply "a corollary" of the other. Corollary or not, the statement "*some* people take offense" to an individual is likely to have a materially different effect on a listener than the statement "*most* people get along" with them. Moreover, the employee's trial testimony left out the "significant detail" that some people take offense to McCoy. *See Williams*, 700 P.2d at 557. Thus, we conclude that the district court's decision to allow the prosecutor to ask the employee about her prior statement was not an abuse of discretion.

### III.  Prosecutorial Misconduct

¶ 17    McCoy contends that the district court erred by permitting the prosecutor to commit misconduct by (1) asking hypothetical questions during voir dire that too closely mirrored the facts of the case; (2) commenting on McCoy's failure to retreat before acting in self-defense; and (3) commenting on McCoy's pretrial silence.  We perceive no reversible error.

### A.    Applicable Law and Standard of Review

¶ 18    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances.  *Id.*  Second, if the conduct was improper, we decide whether it warrants reversal under the proper standard of review.  *Id.*

¶ 19    While a prosecutor can use every legitimate means to bring about a just conviction, they have a duty to avoid using improper methods designed to obtain an unjust result.  *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005).  When determining whether a prosecutor's statements were improper and whether reversal is warranted, we may consider the language used, the

9

context of the statements, the strength of the evidence, whether the prosecutor improperly appealed to the jurors' sentiments, whether the misconduct was repeated, and any other relevant factors. *People v. Walters*, 148 P.3d 331, 335 (Colo. App. 2006).

¶ 20 We review a trial court's ruling on prosecutorial misconduct for a "gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Camarigg*, 2017 COA 115M, ¶ 39 (quoting *People v. Garner*, 2015 COA 175, ¶ 26). If the defendant objected at trial, we review for harmless error. *People v. Sauser*, 2020 COA 174, ¶ 80. Under this standard, reversal is required only if the error affects the substantial rights of the parties by substantially influencing the verdict or affecting the fairness of the trial. *Id.*

¶ 21 If the defendant failed to object at trial, we review for plain error. *Id.* "To constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *People v. McMinn*, 2013 COA 94, ¶ 58.

### B. Hypothetical Voir Dire Questions

¶ 22    McCoy first contends that the prosecutor committed misconduct by asking hypothetical questions during voir dire that too closely mirrored the facts of the case and "rewarded a negative prejudgment" of McCoy.  We disagree.

¶ 23    During voir dire, the prosecutor posed the following hypothetical to prospective jurors:

> So let's say you are so close to home.  You've been in your car for about half an hour.  It's bumper-to-bumper traffic.  You are so close to your exit.  You want to get off, but the person in front of you is not moving.  They're taking forever and being extremely slow, and it's annoying you.
>
> Is there a situation that you can foresee yourself getting out of the car?

The prosecutor then asked how the prospective jurors would react in a similar circumstance, offering questions such as, "Do you [] lay on the horn?  Do you give that person maybe the middle finger?  Do you stay completely silent?  What do you do?"  Defense counsel did not object.

¶ 24    McCoy argues the hypothetical posed by the prosecutor too closely mirrored the facts of the case such that it encouraged the

11

prospective jurors to prejudge McCoy before hearing any of the evidence. Specifically, McCoy asserts the "impatient driver" in the hypothetical represents McCoy, and the sole purpose of the questioning was to discern "whether it was reasonable for the driver (Mr. McCoy) to confront the stationary driver (the three men)." This argument is unconvincing.

¶ 25    The frustrated-driver hypothetical posed by the prosecutor during vior dire does not mirror the facts of this case, which include a verbal altercation purportedly prompted by bullying of an unhoused individual that escalated to a physical fight outside of a bar. Importantly, the purpose of voir dire is for counsel to assess the potential jurors and any beliefs they hold that may introduce bias into the proceedings. *People v. Wilson*, 2013 COA 75, ¶ 12. Here, given the stark differences between the hypothetical and the facts of the case, it is apparent that the prosecutor's questions were not intended to instruct the prospective jurors about the case or encourage them to prejudge the facts, but were intended to explore their biases regarding confrontation generally. Accordingly, we conclude that the prosecutor's use of this hypothetical to determine potential biases or prejudices was not improper.

## C.    Failure to Retreat

¶ 26    McCoy next contends that the prosecutor committed misconduct by misstating the law of self-defense and discussing McCoy's failure to retreat during the confrontation.  Based on the broader context of the prosecutor's statements and questions, we disagree.

¶ 27    During opening statement, the prosecutor referred to McCoy's ability to leave the confrontation:

> Ladies and gentlemen, the defendant in this case knows this area.  He could have taken many different avenues.  He could have walked away from a conversation that, apparently, he was insulted by.  He was in the middle of downtown.  He could have gone inside and asked his friends for help if he ever thought he was in danger.  He could have tried to walk away from the situation.  He could have left in one of six different directions downtown, but he didn't.  *Ladies and gentlemen, the defendant was the initial aggressor here.*

(Emphasis added.)

¶ 28    The prosecutor raised the issue again during her cross-examination of McCoy.  First, the prosecutor questioned why McCoy began "making a semicircle [around the three men] . . . instead of . . . going straight and walking away, [or] turning around[.]"

Later, the prosecutor asked McCoy what stopped him from crossing the street "before [he] assaulted two men."

¶ 29    Finally, the prosecutor revisited the issue during closing argument, telling the jury that after the fight, "[McCoy] chooses to cross the street and leave, the same street that he told you yesterday he couldn't cross in order to avoid the fight because he was afraid of getting smushed." Defense counsel did not object to any of these comments.

¶ 30    McCoy asserts that the prosecutor committed misconduct by commenting on his failure to retreat before using self-defense because prosecutors are categorically prohibited from doing so. We disagree that such a categorical prohibition exists where, as here, the prosecution's theory of the case is that the defendant was the initial aggressor.

¶ 31    Under Colorado law, "a person is justified in using physical force upon another person in order to defend himself . . . from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." § 18-1-704(1), C.R.S. 2024. A non-aggressor — one who did not initiate the contact in question — is entitled to assert self-defense without considering whether a

reasonable person would retreat to safety rather than resorting to physical force. *People v. Toler*, 9 P.3d 341, 347 (Colo. 2000).

¶ 32    Accordingly, a prosecutor "may not argue that a defendant is barred from acting in self-defense unless [he] first retreats from an encounter." *People v. Monroe*, 2020 CO 67, ¶ 20. Nor may a prosecutor argue that a defendant's failure to retreat undermines the reasonableness of their decision to act in self-defense because allowing such an argument would "cripple the no-duty-to-retreat rule." *Id.* at ¶ 30.

¶ 33    However, if the defendant is the initial aggressor — one who initiates the physical conflict, *Castillo v. People*, 2018 CO 62, ¶ 43 — they must first "withdraw[] from the encounter and effectively communicate[] to the other person [their] intent to do so" before using force in self-defense, § 18-1-704(3)(b). *See Monroe*, ¶ 19. In other words, an initial aggressor has a duty to retreat before they are legally justified to use self-defense.

¶ 34    In *Monroe,* the supreme court discussed this distinction in reference to *People v. Martinez*, 224 P.3d 1026 (Colo. App. 2009). *Monroe*, ¶¶ 27-28, 36. In *Martinez*, the defendant had already started to drive away when he observed the victim leaving a bar,

stopped his car, and engaged in a fight. *Martinez*, 224 P.3d at 1029-30. The defendant claimed that he had acted in self-defense because he was "so scared and . . . nervous" about the victim. *Id.* at 1033. In closing, the prosecutor argued that if the defendant was scared and nervous, he could have left, and defense counsel objected, arguing that the prosecutor's comments misstated the no-duty-to-retreat rule. *Id.* at 1031.

¶ 35 The supreme court explained that "when viewed in context, it's clear that the prosecutor's comments were directed, not at the defendant's failure to retreat once he felt threatened, but his *decision to enter the fray*, which arguably made him an initial aggressor." *Monroe*, ¶ 28. In this way, the court distinguished the prosecutor's comments in *Martinez* from the type of comments it prohibited — those "admitted for the purpose of undermining the reasonableness of the defendant's claim that he acted in self-defense." *Id.*

¶ 36 Based on the video of the incident that showed McCoy initiating the physical conflict, the prosecutor made clear during her opening statement that the prosecution's theory was that McCoy "was the initial aggressor," and she did so when discussing

McCoy's available avenues of retreat. The cross-examination questions and closing argument that followed echoed this theory of the case. Given the context, the prosecutor's comments pertaining to McCoy not walking away or crossing the street appear directed at his decision to enter the fray as the initial aggressor rather than a more generalized failure to retreat. *See id.* at ¶ 28.

¶ 37 At a minimum, the prosecutor's comments were not flagrant, glaring, or tremendously improper, so they do not warrant reversal under plain error review. *McMinn*, ¶ 58.

### D. Pretrial Silence

¶ 38 Finally, McCoy contends that the prosecutor committed misconduct during cross-examination and rebuttal closing argument by improperly commenting on McCoy's pretrial silence. We perceive no reversable error.

¶ 39 While prosecutors should avoid commenting on a defendant's pre- or post-arrest silence, "the Fifth Amendment protections do not apply to conduct that occurs in a noncustodial setting." *People v. Rios*, 2020 COA 2, ¶ 24 (quoting *People v. Thomas*, 2014 COA 64, ¶ 25). Further, even if such a comment is made, "reversible error

exists only when the prosecutor uses the defendant's silence as a means of implying guilt." *Id.*

### 1. Questions About McCoy's Whereabouts

¶ 40 First, while discussing his whereabouts leading up to the physical confrontation, McCoy testified on cross-examination that he visited a nearby Walgreens before the fight started. On direct examination, however, McCoy said that he visited Walgreens after the physical altercation had concluded. The prosecutor asked McCoy, "So . . . you going to the Walgreens, you coming back . . . , we don't have a recording of any of that, do we?" McCoy responded, "Right." The prosecutor continued, "So today is the first time that we're hearing about any of that, right?" Defense counsel did not object.

¶ 41 McCoy argues that the prosecutor's last question is an improper comment on his pretrial silence. Viewed in context, however, the prosecutor was referencing the discrepancy between McCoy's direct and cross-examination testimony, which is not a comment on pretrial silence at all, but an attack on the credibility of McCoy's trial testimony.

## 2. Questions About Threats

¶ 42    Second, McCoy testified on cross-examination that the men "came around the corner and said, 'We're going to fucking kill you now, you fucking [N word].'" He continued, "If someone threatens to kill you, ma'am, you should probably believe them." The prosecutor responded, "You should. Although this is the first time that we are hearing that somebody threatened to kill you. That's all." Defense counsel did not object.

¶ 43    Again, McCoy argues that the prosecutor's statement about hearing a part of McCoy's story for the first time at trial is an improper comment on his pretrial silence. Unlike the first comment, the second comment is not so clearly directed at a discrepancy in McCoy's trial testimony because McCoy testified to the same threat on direct examination. But it is not directed at McCoy's *custodial* silence either. *See id.* at ¶ 24.

¶ 44    McCoy testified on direct examination that he did not engage with police at the scene but spoke with people at the bar afterward. McCoy also said he did not know police were looking for him until they arrested him on a warrant sometime later. And there does not appear to be evidence that McCoy was subject to a custodial

interview. Given this record, the prosecutor's comment was not obviously a comment on McCoy's pretrial, custodial silence. Rather, the comment is more reasonably interpreted as a proper attempt to undermine McCoy's version of events.

### 3. Questions About Contacting Police

¶ 45 Third, during an exchange concerning why McCoy failed to discuss the incident with law enforcement following the confrontation, the prosecutor asked McCoy if he failed to contact the police about the incident because he did not believe the police would be looking for him. Following McCoy's explanation of why he left the scene and then came back, the prosecutor asked, "[I]n any case, you never tried to talk to the police about what happened in this case, correct?" McCoy said, "I would have if someone had asked me. If they came to the scene while I was on the scene, I would have happily told them everything that happened and that I had been assaulted."

¶ 46 McCoy argues that the prosecutor's question about talking to the police was an improper comment on his pretrial silence. As an initial matter, we note that McCoy testified on direct examination that the police were not on scene when he returned after the fight

20

but that he "would have waited around if [he] would have thought the police were en route." The prosecutor's question fairly sought to expound upon McCoy's direct testimony.

¶ 47    Moreover, it is clear the prosecutor was inquiring into conduct that occurred, if at all, in a noncustodial setting. If there were no police present at the scene after the altercation, then McCoy's supposed silence during that time was necessarily noncustodial. And if McCoy had voluntarily sought out the police sometime later to report the fight, his silence then would likewise be noncustodial. Because the specific conduct implicated by the question was noncustodial, it was not improper for the prosecutor to ask about it. *See id.*

### 4.    Closing Argument Comments

¶ 48    Lastly, McCoy contends that the prosecutor committed misconduct by improperly commenting on his pretrial silence when she repeatedly used the phrase "for the very first time, we hear . . ." during closing argument. In the first instance, the prosecutor stated "[f]or the very first time, yesterday, we hear: . . . '[t]hey told me they were going to fucking kill me, you N word.'" Later, she followed up stating, "we hear for the first time on cross-examination

that he was spit on[.]"  Finally, in discussing the threats that McCoy testified to, she again stated, "for the very first time," at which point McCoy's counsel objected.

¶ 49    For the same reasons we concluded that the prosecutor's cross-examination questions about McCoy mentioning threats for the first time at trial were not improper, we conclude that her closing argument on the same issue was not improper.  The argument was not a comment on custodial pretrial silence but an attack on the believability of McCoy's story.  In fact, immediately following this part of her closing argument, the prosecutor referred the jurors to the instruction on credibility and asked them to "examine not only that statement, but everything else that came off of that witness stand yesterday from Mr. McCoy."

¶ 50    The prosecutor's comment that "for the first time on cross-examination" McCoy stated that he was spat on during the fight was most reasonably viewed as a comparison between McCoy's direct and cross-examination, rather than a comment on pretrial silence.  Indeed, any doubt about the comparison being drawn was erased when, immediately after the prosecutor made this comment,

she said, "He didn't say that when his attorney was doing his direct examination."

¶ 51 Finally, even if the prosecutor's questions and argument could somehow be viewed as commenting on McCoy's custodial pretrial silence, the prosecutor did not use the statements as a means of implying McCoy's guilt, but instead to impeach McCoy's testimony. *See id.* Ultimately, we conclude that the prosecutor did not improperly comment on McCoy's custodial pretrial silence.

## IV.   Cumulative Errors

¶ 52 McCoy contends that, even if the alleged errors individually do not warrant reversal, their cumulative prejudice does. When reviewing for cumulative error, we ask whether "numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial." *Howard-Walker v. People*, 2019 CO 69, ¶ 24. However, for the doctrine to apply, numerous errors must have been committed, not merely alleged. *People v. Shanks*, 2019 COA 160, ¶ 76.

¶ 53 Although we expressed some concern with the prosecutor's comments about McCoy's duty to retreat, we concluded that any

23

error was not plain.  Because we found no other errors, there can be no cumulative error.

## V.    Disposition

¶ 54    The judgment is affirmed.

JUDGE WELLING and JUDGE MOULTRIE concur.