23CA0083 Peo v Brophy 12-26-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0083
Mesa County District Court No. 21CA1934
Honorable Valerie J. Robison, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mary Catherine Brophy,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Lipinsky and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

Philip J. Weiser, Attorney General, Abigail Armstrong, Assistant Attorney
General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Mary Catherine Brophy, appeals the judgment of conviction entered on jury verdicts finding her guilty of attempted first degree murder, attempted second degree murder, first degree assault, menacing, and reckless endangerment.  We affirm.

## I.     Background

¶ 2     Mary and her husband, Brad, lived together with Ryan, Brad's intellectually disabled adult son.[1]  Although Mary and Brad slept in different bedrooms, Brad would often go into Mary's bedroom to use the adjoining bathroom.

¶ 3     While in her bedroom one evening, Mary sent Brad a text message saying that he could take a shower in the adjoining bathroom.  After Brad took his shower, he walked into Mary's bedroom and sat next to her on the bed.  They argued.  Mary pulled out a revolver from her bedside table, stood, walked around the bed, and, as she was leaving the bedroom to go into the living room, turned around in the doorway to face Brad.

---

[1] Because Mary, Brad, and Ryan share the same last name, we refer to them by their first names to avoid confusion.  We mean no disrespect in doing so.

¶ 4    Video surveillance footage from the living room showed Mary pointing the gun at Brad's chest, Brad grabbing her wrist to shove the gun down, and Mary shooting Brad in the upper thigh — breaking his femur — as he did so.  Brad fell.  Ryan called 911 (he incorrectly told the dispatcher that his father had fallen and hurt his leg) while Mary put away the gun, pulled up a chair, sat next to Brad, and offered no assistance during the thirteen minutes it took the first responders to arrive.  Mary later told the police that Brad had attacked her by grabbing her wrists, so she had grabbed her gun and told him, "[G]et out of my fucking bedroom . . . or I will shoot you."

¶ 5    The People charged Mary with attempted first degree murder, attempted second degree murder, first degree assault, menacing, reckless endangerment, and prohibited use of a weapon.  The People charged all the offenses as acts of domestic violence.

¶ 6    At trial, defense counsel argued that Mary pointed the gun at Brad in self-defense after he refused her demand to leave her alone but that the shooting had been accidental.

¶ 7    The jury found Mary guilty as charged.[2]  The district court sentenced her to a controlling term of thirty-two years in the custody of the Department of Corrections.

## II.    Discussion

¶ 8    Mary contends that (1) the district court abused its discretion by admitting improper character evidence; (2) the court plainly erred by instructing the jury on the initial aggressor and provocation exceptions to self-defense; (3) the prosecution presented insufficient evidence to sustain her attempted first and second degree murder convictions; and (4) prosecutorial misconduct deprived her of a fair trial.  We address the sufficiency of the evidence first and then turn to Mary's other contentions.[3]

### A.    Sufficiency of the Evidence

¶ 9    Mary contends that we must vacate her convictions for attempted first and second degree murder because the prosecution

---

[2] Although the jury found Mary guilty of the prohibited use of a weapon charge, the court dismissed this count at the People's request during sentencing because of a notice issue.

[3] We address the sufficiency of the evidence first because "if a defendant is entitled to reversal of her convictions on appeal due to insufficient evidence, the guarantees against double jeopardy in the United States and Colorado Constitutions may preclude retrial." *People v. Marciano*, 2014 COA 92M-2, ¶ 42.

presented insufficient evidence to prove that she possessed the requisite mens rea to commit those offenses. We disagree.

### 1. Standard of Review

¶ 10 "In reviewing the sufficiency of the evidence, we determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is both 'substantial and sufficient' to support the defendant's guilt beyond a reasonable doubt." *People v. Douglas*, 2015 COA 155, ¶ 8 (quoting *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005)).

### 2. Applicable Law

¶ 11 To convict Mary of attempted first degree murder, the prosecution needed to prove that she intentionally "engage[d] in conduct constituting a substantial step toward" causing Brad's death. § 18-2-101(1), C.R.S. 2024; *see* § 18-3-102(1)(a), C.R.S. 2024 (a person commits first degree murder if, "[a]fter deliberation and *with the intent* to cause the death of a person other than [her]self, [s]he causes the death of that person") (emphasis added); *see also* § 18-1-501(5), C.R.S. 2024 ("A person acts 'intentionally' or 'with intent' when [her] conscious objective is to cause the specific

4

result proscribed by the statute defining the offense.").[4] To convict Mary of attempted second degree murder, the prosecution needed to prove that she knowingly engaged in such conduct. *See* § 18-2-101(1); § 18-3-103(1)(a), C.R.S. 2024; *see also* § 18-1-501(6), C.R.S. 2024 ("A person acts 'knowingly' . . . , with respect to a result of [her] conduct, when [s]he is aware that [her] conduct is practically certain to cause the result.").

### 3.    Analysis

¶ 12    We conclude that substantial evidence supported the intent and knowledge requirements of Mary's attempted first and second degree murder convictions.

¶ 13    As noted, the jury watched video surveillance footage of the shooting: Mary stood in the doorway — blocking Brad from leaving her bedroom — and pointed the gun at Brad's chest, Brad shoved the gun down, and Mary shot him at close range in the upper thigh as he did so. Brad also testified about the manner in which Mary shot him. *See People v. Webster*, 987 P.2d 836, 843 (Colo. App. 1998) ("Evidence of the manner and method of the killing, or

---

[4] Mary doesn't challenge the sufficiency of the evidence as to the deliberation requirement of attempted first degree murder.

5

attempted killing, may be sufficient to support an inference of the necessary intention" for attempted first degree murder.).

¶ 14     The prosecution also introduced other circumstantial evidence to prove that Mary acted intentionally and knowingly. That evidence — which, as explained below, the court properly admitted — included audio recordings from one year before the shooting of Mary threatening to murder Brad and "make it look like an accident"; Brad's testimony about Mary's mood swings and "violently mad" demeanor, their increasingly tumultuous relationship, and their previous fights; pictures of injuries Mary had previously caused Brad; pictures of Mary's text messages to Brad on the days leading up to the shooting; and video surveillance footage showing Mary's disregard for Brad after she shot him. *See People v. Dist. Ct.*, 926 P.2d 567, 571 (Colo. 1996) ("[I]ntent[] can rarely be proven other than through circumstantial or indirect evidence. Such evidence may include . . . the existence of hostility between the accused and the victim.") (citation omitted).

¶ 15     Based on this evidence, the jury could reasonably have inferred that Mary possessed the requisite intent and knowledge for attempted first and second degree murder. *See People v. Grant*, 174

P.3d 798, 812 (Colo. App. 2007) ("If there is evidence upon which one may reasonably infer an element of the crime, the evidence is sufficient to sustain that element.").

¶ 16 Mary asserts, however, that she retained control of the gun as she lowered it and shot Brad and that she couldn't have been practically certain that shooting him in the leg would kill him because "someone dying as a result of a leg injury is exceedingly rare." But the jury interpreted the evidence differently, and we won't second-guess its interpretation. *See Clark v. People*, 232 P.3d 1287, 1293 (Colo. 2010) ("Jurors must rely on the evidence presented at trial and their own common sense to determine the question of guilt. . . . We do not sit as a thirteenth juror to determine the weight of the evidence presented to the jury.") (citations omitted).

### B. Character Evidence

¶ 17 Mary next contends that the district court abused its discretion by admitting certain character evidence in violation of CRE 401, CRE 403, and CRE 404(b). Again, we disagree.

### 1. Standard of Review and Applicable Law

¶ 18    We review a district court's evidentiary rulings for an abuse of discretion. *Nicholls v. People*, 2017 CO 71, ¶ 17. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or based on a misunderstanding or misapplication of the law. *People v. Thompson*, 2017 COA 56, ¶ 91. We may affirm a court's evidentiary ruling on any basis supported by the record. *People v. Quintana*, 882 P.2d 1366, 1371 (Colo. 1994), *abrogated on other grounds by Rojas v. People*, 2022 CO 8.

¶ 19    Mary's counsel objected to the district court's admission of most, but not all, of the evidence that Mary challenges on appeal. We review any claim of error that counsel preserved by objection for harmlessness. *Hagos v. People*, 2012 CO 63, ¶ 12. Under this standard, "we reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)). We review any claim of error that counsel didn't preserve by objection for plain error. *Id.* at ¶ 14. Plain error is error that is obvious and that so undermined the fundamental fairness of the trial itself as to

cast serious doubt on the reliability of the judgment of conviction. *Id.*

¶ 20     Evidence of "other crime[s], wrong[s], or act[s]" is inadmissible to show that a defendant has a bad character and acted in conformity therewith. CRE 404(b)(1). But such evidence may be admissible to prove, for instance, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2). Similarly, "evidence of any other acts of domestic violence between the defendant and the victim" may be admissible in domestic violence cases. § 18-6-801.5(2), C.R.S. 2024; *see* § 18-6-801.5(1) ("[E]vidence of similar transactions can be helpful and is necessary in some situations in prosecuting crimes involving domestic violence" because "domestic violence is frequently cyclical in nature, involves patterns of abuse, and can consist of harm with escalating levels of seriousness.").

¶ 21     Evidence of a defendant's other acts, including other acts of domestic violence under section 18-6-801.5(2), is subject to the four-part test articulated in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). That test asks whether (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the evidence's

logical relevance is independent of the inference that the defendant acted in conformity with a bad character; and (4) the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *Id.*

### 2. Analysis

¶ 22 Mary challenges the district court's admission of the following evidence:

- An audio recording from the day of the shooting in which Mary told Brad, "I fucking hate you," because he couldn't "control" Ryan, whom she called "retarded" six times.

- An audio recording from the day of the shooting in which Mary told Brad, "You're going to die on the table in two weeks anyways, and [Ryan] can get kicked out of the fucking house."

- Pictures of Mary's text messages to Brad on the days leading up to the shooting saying, "[C]ongratulations on making yourself the a****** of the day"; "I can't believe what a f****** loser you are that you can't even get that little jerk [Ryan] to pick up the s*** that you asked him to when I f****** heard you ask him to pick it up yesterday

10

what is your f****** problem control that dick face"; "If that s*** isn't picked up today off the back patio I will throw every single one of the Christmas presents for Ryan under the tree in the trash"; "Sure hope that pup likes 29° weather cuz he's locked in the backyard f*****"; and, "[Y]ou have failed to f****** provide your wife with medical insurance cuz you're too f****** cheap but do you have medical insurance yes and does the retard have medical insurance yes do the dogs get treated at the veterinarian of course they do but do I f*** you."[5]

- Brad's testimony about six of his previous fights with Mary and pictures of his resulting injuries establishing that (1) Mary hit Brad's face and neck with a pan; (2) Mary pushed Brad; (3) Mary punched Brad's face; (4) Mary clawed at Brad's collarbone; (5) Mary hit Brad's hand with a yardstick; and (6) Mary burned Brad's chin and chest by throwing hot tea on him, then yelled, "I was aiming for your fucking eyes."

---

[5] The asterisks appear in the original text messages Mary sent Brad.

- An audio recording from one year before the shooting in which Mary told Brad, "Get out of my fucking face or I will go get that fucking gun."

- An audio recording from one year before the shooting in which Mary told Brad, "I will stab you with this [knife] if you touch me," and called Ryan "retarded."

- An audio recording from one year before the shooting in which Mary told Brad, "I [would] put you in a fucking home and let Ryan live there with you to wipe your ass."

- An audio recording from one year before the shooting in which Mary told Brad, "Get the fuck out of my way or I'll fucking murder you, I swear to God I will. . . . Honey, there [are] so many ways to make it look like an accident."

- An audio recording from one year before the shooting in which Mary mocked Brad about the dishes in the sink.

¶ 23    Mary contends that her statements in the audio recordings from the day of the shooting were inadmissible under CRE 401 and CRE 403, which generally provide that relevant evidence is admissible unless the evidence's probative value is substantially

outweighed by the danger of unfair prejudice. She asserts that her statement to Brad ("You're going to die on the table in two weeks anyways.") painted her as a vindictive person, and her statements about Ryan (desiring to kick him out of the house, calling him retarded, and saying that Brad couldn't control him) were irrelevant because Ryan wasn't the victim and were highly prejudicial because "any juror who has a loved one with an intellectual disability would have become emotional hearing Mary talk about Ryan in such terms."

¶ 24 The district court determined that Mary's statements were admissible under CRE 401 and CRE 403. We don't see any abuse of discretion in that ruling. Mary's statements to Brad that she hated him because he couldn't control Ryan were relevant to prove her motive and intent — issues the defense contested at trial. Mary's statements were also relevant to rebut her claims that she had acted in self-defense and accidentally shot Brad. And although Mary's statements may have carried a risk of unfair prejudice, CRE 403 strongly favors the admission of relevant evidence, *see People v. Dist. Ct.*, 869 P.2d 1281, 1286 (Colo. 1994), and "we must assume the maximum probative value that a reasonable factfinder might

give to the evidence and the minimum unfair prejudice that might reasonably be expected." *People v. Skinner*, 53 P.3d 720, 723 (Colo. App. 2002) (citing *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995)).

¶ 25     Mary challenges the remaining evidence — her text messages to Brad on the days leading up to the shooting, Brad's testimony about his previous fights with Mary, pictures of his resulting injuries, and audio recordings from one year before the shooting — on CRE 404(b) grounds.  She asserts that this evidence was inadmissible under *Spoto* because it was unduly prejudicial and because any relevance of her prior acts depended on the prohibited inference that she committed the charged offenses because she acted in conformity with her bad character.

¶ 26     The district court determined that most of this evidence didn't implicate *Spoto* because it involved mere statements, which it concluded aren't "other acts" under CRE 404(b).  We tend to agree with the court that statements that themselves don't constitute crimes aren't acts and therefore don't fall under CRE 404(b).  *See People v. Greenlee*, 200 P.3d 363, 368 & n.9 (Colo. 2009) (holding that CRE 404(b) didn't apply to the defendant's statements because

14

his "words are not conduct, do not amount to a crime, and do not reveal prior bad acts" and clarifying that CRE 404(b) can apply to statements that constitute crimes, such as witness tampering and threatening a witness (first citing *People v. Medina*, 51 P.3d 1006, 1012-13 (Colo. App. 2001); and then citing *People v. Eggert*, 923 P.2d 230, 234 (Colo. App. 1995))), *abrogated on other grounds by Rojas*, 2022 CO 8.[6]

¶ 27 We don't need to resolve this question, however, because all the evidence Mary challenges on appeal was admissible under CRE 404(b) and section 18-6-801.5(2). Mary's text messages on the days leading up to the shooting were relevant to show her anger toward Brad and Ryan and, by further inference, her motive and intent to kill Brad. Her previous statements, threats, and fights with Brad

---

[6] Although the Colorado Supreme Court abrogated *People v. Greenlee*, 200 P.3d 363 (Colo. 2009), in *Rojas v. People*, 2022 CO 8, it didn't address *Greenlee*'s holding that CRE 404(b) doesn't apply to statements that don't constitute a crime or reveal a prior bad act. Instead, the court overturned *Greenlee*'s holding that if extrinsic evidence implicates a defendant's character but has relevance independent of the prohibited act-propensity inference, CRE 404(b) doesn't govern its admissibility. *Rojas*, ¶ 35 (citing *Greenlee*, 200 P.3d at 368). The court explained, "[T]his criterion is simply part of the 404(b) analysis under [*People v. Spoto*, 795 P.2d 1314 (Colo. 1990)], not a basis for avoiding Rule 404(b)." *Rojas*, ¶ 35.

were also relevant to prove her state of mind because they made it less likely that she acted in self-defense and accidentally shot him. *See* CRE 404(b) (evidence of a defendant's other acts may be admissible to prove, among other things, motive, intent, absence of mistake, and lack of accident); § 18-6-801.5(2) (evidence of "any other acts of domestic violence between the defendant and the victim" may be admissible in domestic violence cases). This evidence's relevance didn't depend on the inference that Mary acted in conformity with her bad character when she shot Brad. *See Spoto*, 795 P.2d at 1318. And the danger of unfair prejudice didn't substantially outweigh the evidence's probative value; the court minimized the prejudicial effect of most of this evidence by instructing the jury as follows:

> [Y]ou are about to hear evidence regarding prior acts or statements of [Mary]. You are instructed that you cannot use this particular evidence to show that [Mary] has a bad character or that [Mary] acted in conformity therewith on a particular occasion.
>
> Rather, this evidence is being presented for the purpose of showing [Mary]'s knowledge, intent, deliberation, lack of mistake or accident, and her attitude towards [Brad] only. You may not consider it for any other purpose.

16

*See People v. Villa*, 240 P.3d 343, 352 (Colo. App. 2009) ("Absent evidence to the contrary, we assume the jury heeded the court's instructions.").[7]

¶ 28     Although the court didn't give limiting instructions for the video surveillance footage from the day of the shooting or for Mary's text messages to Brad,[8] it wasn't required to do so because Mary's counsel didn't request them for that evidence. *See People v. Griffin*, 224 P.3d 292, 298 (Colo. App. 2009) ("As a general rule, defense counsel is charged with the task of deciding whether a limiting instruction is desirable. . . . [A]bsent a special statutory requirement, the supreme court has consistently held that trial courts have no duty to give limiting instructions sua sponte.")

---

[7] To the extent Mary challenges the limiting instruction's language as "overly broad," her attorney waived this argument by explicitly assenting to such language. *See People v. Carter*, 2021 COA 29, ¶ 30 (the defendant waived his constructive amendment claim because "[d]efense counsel expressly indicated that she had been through the instructions" and verdict form at issue, "the court went through each instruction and the verdict forms one by one with counsel," and "[d]efense counsel said she didn't object to any of them"). In any event, the language wasn't overly broad. The court told the jury to consider the evidence for only five purposes, all of which were, under the circumstances, proper under CRE 404(b).

[8] Mary also asserts that the district court didn't give a limiting instruction for one of the audio recordings from one year before the shooting, but our review of the record shows that the court did so.

(citations omitted); *see also People v. Torres*, 141 P.3d 931, 935 (Colo. App. 2006) ("Section 18-6-801.5[(5)] requires a trial court to instruct the jury on the limited purposes for which the evidence of prior acts of domestic violence is being admitted. However, when, as here, defendant does not object to the lack of contemporaneous limiting instructions or request additional ones, reversal for lack of a limiting instruction is not required.") (citation omitted).

¶ 29   In sum, we conclude that the district court acted within its discretion by admitting all of this evidence.

### C.   Initial Aggressor and Provocation Instructions

¶ 30   Next, Mary contends that the district court erred by instructing the jury on the initial aggressor and provocation exceptions to self-defense because the prosecution didn't present sufficient evidence to warrant giving these instructions. We aren't persuaded.

### 1.   Applicable Law and Standard of Review

¶ 31   A defendant may claim self-defense as a justification for criminal behavior if she defended herself from what she reasonably believed to be the use or imminent use of unlawful physical force and used a degree of force reasonably necessary to defend herself.

§ 18-1-704(1), C.R.S. 2024.  But a defendant may not claim self-defense if she was the initial aggressor.  § 18-1-704(3)(b)  An initial aggressor is one who "initiated the physical conflict by using or threatening the imminent use of unlawful physical force."  *Castillo v. People*, 2018 CO 62, ¶ 41 (quoting *People v. Castillo*, 2014 COA 140M, ¶ 14).  Nor may a defendant claim self-defense if, "[w]ith intent to cause bodily injury or death to another person, [s]he provoke[d] the use of unlawful physical force by that other person."  § 18-1-704(3)(a).

¶ 32    A court should instruct the jury regarding the initial aggressor or provocation exceptions to self-defense if some evidence supports the exceptions.  *Galvan v. People*, 2020 CO 82, ¶ 25.

¶ 33    We review de novo whether sufficient evidence supports a jury instruction.  *Castillo*, 2018 CO 62, ¶ 32.

¶ 34    Because Mary's counsel didn't object to the jury instructions at issue, we review any error for plain error.  *See Hagos*, ¶ 14.

### 2.    Analysis

¶ 35    With regard to the initial aggressor exception, Mary reasons that the prosecution presented no evidence that she used unlawful physical force against Brad before shooting him.

19

¶ 36    But this exception isn't so limited; as noted, it applies if the defendant initiated the physical contact "by using *or threatening the imminent use of* unlawful physical force."  *Castillo*, 2018 CO 62, ¶ 41 (emphasis added) (quoting *Castillo*, 2014 COA 140M, ¶ 14).

¶ 37    Because the record contains sufficient evidence — the admissibility of which Mary doesn't challenge on appeal — that Mary threatened the imminent use of unlawful physical force against Brad, we conclude that the initial aggressor instruction was proper.  Brad testified, and video surveillance footage showed, that Mary pointed her gun at Brad's chest before shooting him at close range.  The prosecution also introduced into evidence an audio recording in which Mary told the police that she had grabbed her gun and said, "[G]et out of my fucking bedroom . . . or I will shoot you," before shooting Brad.  *See Griffin*, 224 P.3d at 300 ("[The defendant]'s initial verbal confrontation was insufficient to make her the initial aggressor[,] [b]ut evidence of her other actions — such as leaving the argument and returning with a gun — was sufficient to warrant the instruction.") (citation omitted).

¶ 38    We also conclude that the provocation instruction was proper.  Mary asserts that the prosecution presented no evidence that she

"'goad[ed]' Brad into attacking her." *See Galvan,* ¶ 19 (The provocation exception defeats a defendant's self-defense claim if, among other things, "the defendant intended his provocation to goad the other person into attacking him in order to provide a pretext to injure or kill that person."). The record shows otherwise. In addition to Mary's statement to police, the jury heard Brad's testimony that he shoved Mary's wrist because she had pointed the gun at his chest; Mary's additional statement to the police that, after Brad started arguing with her and before she shot him, he had attacked her by grabbing her wrists, causing bruises and a scratch mark; and audio recordings from one year before the shooting in which Mary told Brad, "Get out of my fucking face or I will go get that fucking gun," and, "Get the fuck out of my way or I'll fucking murder you, I swear to God I will. . . . Honey, there [are] so many ways to make it look like an accident." *See People v. Roberts-Bicking,* 2021 COA 12, ¶¶ 38-40 (sufficient evidence supported a provocation instruction because the defendant's statement, "If you want to fuck with me, try it," could be interpreted as an attempt to provoke the victim to use force so that the defendant could shoot the victim).

## D. Prosecutor's Statements

¶ 39 Lastly, Mary contends that the prosecutor engaged in five instances of misconduct and that the alleged misconduct's cumulative effect deprived her of a fair trial. We don't see any misconduct.

### 1. Standard of Review

¶ 40 In reviewing Mary's prosecutorial misconduct claim, we first review the prosecutor's remarks to determine whether they were improper based on the totality of the circumstances. *See Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). If we determine that any of the remarks were improper, we review them for plain error because Mary's counsel didn't object to any of the allegedly improper comments. *See Hagos*, ¶ 14; *see also Wend*, 235 P.3d at 1096 (if conduct was improper, we decide whether it requires reversal under the appropriate standard of review).

¶ 41 "If we find multiple instances of prosecutorial misconduct, we 'must carefully review whether the cumulative effect of the prosecutor's statements so prejudiced the jury's verdict as to affect the fundamental fairness' of the trial." *People v. Buckner*, 2022

COA 14, ¶ 20 (quoting *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005)).

## 2. Analysis

### a. Burden of Proof

¶ 42      Mary argues that, during opening statement, the prosecutor impermissibly shifted the state's burden of proof to the defense by saying,

> The defense does not have to give an opening statement at the beginning of trial, or at all. They do not have to provide evidence or reveal strategic decisions or anything to the People at all.
>
> So just be aware the first time that the People are hearing things from the defense, if we do, it will be at the same time as you do.

¶ 43      But Mary's opening brief omits the prosecutor's statement that immediately followed: "This is because the People always have the burden.  In our system of justice, we always have the burden of proving the case, and there is never a requirement on a person who is accused to prove their own innocence . . . ."

¶ 44      When viewed in context, the prosecutor's statement accurately informed the jury of the state's burden of proof.  *See People v. Santana*, 255 P.3d 1126, 1131 (Colo. 2011) (we must evaluate the

prosecutor's comments in light of the entire record to determine whether the prosecution actually shifted the burden of proof). The prosecutor didn't say, or even imply, that Mary bore the burden of proving her innocence. *See id.* at 1133 (finding no burden shifting where "the prosecutor never explicitly argued that the defendant ha[d] the burden of proof"). To the contrary, the prosecutor told the jury that "the People always have the burden." To the extent the prosecutor commented on the lack of evidence supporting the defense's theory, this comment didn't shift the state's burden. *See People v. Walker*, 2022 COA 15, ¶ 41 ("Commenting on the lack of evidence supporting a defense theory does not shift the burden of proof.").

### b. "Power and Control"

¶ 45 During closing argument, the prosecutor told the jury that Mary's behavior toward Brad was "all part of the power and control in domestic violence." Mary argues that this statement was improper because the concept of "power and control" in domestic violence implicates specialized information and because the prosecution didn't present any evidence at trial to support the statement.

¶ 46    Mary analogizes the prosecutor's statement to those in *People v. Davis*, 280 P.3d 51 (Colo. App. 2011), and *People v. Nardine*, 2016 COA 85.  In *Davis*, the division determined that the prosecutor's slideshow on the "stages" experienced by trauma victims in domestic violence situations and commentary on how the victim's behavior fit in those stages was improper because it described "a variation of rape trauma syndrome," evidence of which is admissible only through expert testimony, and because it wasn't "wholly rooted in the evidence presented at trial."  280 P.3d at 53-54.  In *Nardine*, the division determined that the prosecutor's statement that the victim's failure to realize that she had been sexually assaulted was "not an uncommon reaction among female sexual assault victims" was improper because it "implicated specialized information pertaining to social science that is not commonly known to laypersons," and because the prosecutor didn't present any evidence to support the statement.  *Nardine*, ¶ 58.

¶ 47    We aren't persuaded that the statement in this case was akin to those in *Davis* and *Nardine*.  Unlike the stages of trauma and reactions of female sexual assault victims, the concept of power and control in domestic violence is commonly understood.  *People v.*

25

*Miller*, 2024 COA 66, ¶¶ 25, 29 (the prosecutor's references to several domestic violence concepts, including "power and control," were proper, in part because they "reflected the jurors' common understanding of domestic violence concepts"); *see Kendrick v. Pippin*, 252 P.3d 1052, 1064 (Colo. 2011) ("[J]urors may apply their general knowledge and everyday experience when deciding cases . . . ."), *abrogated on other grounds by Bedor v. Johnson*, 2013 CO 4. Because the People charged all the offenses as acts of domestic violence, the concept was also reflected in the jury instructions that defined "domestic violence" to include "crime[s] against a person . . . when used as a method of coercion, control, punishment, intimidation, or revenge directed against a person with whom the actor is or has been involved in an intimate relationship."

¶ 48     For these reasons, we conclude that the prosecutor's "power and control" reference was proper.

### c. Reasonableness of Self-Defense

¶ 49     During closing argument, the prosecutor said,

> Serious bodily injury, so we have again a kind of wordy definition, but you did hear Dr. Meyer who rendered emergency treatment to [Brad]. You heard him talk about that compound fracture, the bone kind of overlapping, the

substantial risk of serious disfigurement that [Brad] faced and how close the bullet came to his artery. That's in self-defense. So when you're considering reasonableness, even the statements of [Mary] as she says — as she — as she tells them about what happened. That [Brad] had been in the bedroom, grabbed her wrist, injured her arm, and then left. Went around to the bed. That's five to six feet away at the door. Was her waving a firearm reasonable? Was her depressing the trigger reasonable?

¶ 50 Mary argues that, by making this statement, the prosecutor "improperly argu[ed] that, when assessing the reasonableness of Mary's self-defense, the jurors could take into account what could have happened had Brad's injury been worse." We aren't convinced that the prosecutor made this argument. But even if she did, we aren't aware of any legal authority prohibiting the jury from considering the risk of a defendant's actions when assessing the reasonableness of self-defense. To the contrary, the Colorado Supreme Court has held that the jury "may consider all relevant evidence when assessing the reasonableness of the defendant's [self-defense] actions." *Riley v. People*, 266 P.3d 1089, 1094 (Colo. 2011) (citing *People v. Jones*, 675 P.2d 9, 14 (Colo. 1984)).

27

¶ 51     *People v. Monroe*, 2020 CO 67, and *People v. Vigil*, 2021 CO 46, on which Mary relies, don't require a different conclusion.  In *Monroe*, the supreme court reaffirmed the principle that the jury should consider a defendant's perception of events as they unfold, *Monroe*, ¶ 34, but held that prosecutors may not argue that a defendant's failure to retreat undermines the reasonableness of self-defense because such an argument "would cripple the no-duty-to-retreat rule" and confuse and provide little value to the jury, *id.* at ¶¶ 29-32.  This case doesn't involve retreat, much less an argument that the jury should consider Mary's failure to retreat when assessing the reasonableness of her self-defense claim.

¶ 52     *Vigil* is likewise inapposite.  In that case, the supreme court held that "the facts of the actual injury control the substantial risk of death determination under [the statute defining serious bodily injury], *not* the risk generally associated with the type of conduct or injury in question."  *Vigil*, ¶ 45.  But Mary argues that the prosecutor misstated the law only as to the reasonableness of her self-defense claim, not as to the serious bodily injury requirement.

¶ 53     We agree with the People that Dr. Meyer's testimony regarding the risk associated with Mary's conduct was relevant to the jury's

28

assessment whether Mary's self-defense was reasonable and that the prosecutor's statement was thus permissible. *See Riley*, 266 P.3d at 1094 (the jury "may consider all relevant evidence" in assessing the reasonableness of self-defense).

### d.  "Knowingly" Definition

¶ 54    Mary argues that, during closing argument, the prosecutor misstated the definition of "knowingly" for attempted second degree murder. She reasons, "[T]he prosecutor was arguing that the mental state element was met because [Mary] knew that depressing the trigger would fire a bullet. But knowing that a revolver will fire a bullet is a far cry from being 'practically certain' that death will result when the revolver is pointed at a leg."

¶ 55    We disagree with Mary's characterization of the prosecutor's argument. When discussing the elements of first degree assault, the prosecutor said,

> Knowingly. . . .  She's aware her conduct is practically certain to cause the results. Someone who has training — well or at least as a group, you know, familiar with firearms, right?  She's been to the range.  She's a better shot than Brad.  They have firearms.  They know how to use . . . [and] load them.  She depresses that trigger, that 7-1/2 to 8-1/2 pound pull.  She traps him.  Did she know

29

what was going to happen when she pulled that trigger? Certainly she acted knowingly and that knowingly is the standard for menacing.

The prosecutor then discussed the remaining elements of menacing. Thus, in context, the prosecutor defined "knowingly" as to first degree assault and menacing.

¶ 56    To be sure, when the prosecutor later discussed attempted second degree murder, she said, "[T]his is going to be back to that knowingly standard." But the prosecutor never said, or even implied, that Mary met the knowingly requirement for attempted second degree murder because she knew that pulling the trigger would fire a bullet. In fact, she never said or implied that Mary met the knowingly requirements for first degree assault and menacing by knowing as much. Rather, the prosecutor correctly defined "knowingly" as being aware that one's conduct is practically certain to cause the result, *see* § 18-1-501(6), and asked the jurors the more open-ended question, "Did she know what was going to happen when she pulled that trigger?" We don't see anything wrong with this language. *See Domingo-Gomez*, 125 P.3d at 1048-49 (While a prosecutor may not intentionally misstate the law,

"[a]dvocates must be able to present their best case to achieve just results. For this reason, a prosecutor has wide latitude in the language and presentation style used to obtain justice.").

### e.     Emotional Appeal

¶ 57     Mary argues that the prosecutor impermissibly appealed to the jurors' sympathy for Ryan during closing argument by saying,

> Ryan makes [the 911] call, and Ryan, who Mary will later say has the mentality of a six year old, she doesn't even trust him to take care of the dogs. He can't handle that, but he's the one making this emergency phone call. He's the one on the line with dispatch for 13 minutes. He's left to the task to try to explain the severity of the situation. Mary is the only person — the only functioning adult who is able to talk to 911 and relay the proper information, but she leaves it to whom she believes is a six year old.

¶ 58     But the jury could reasonably have interpreted the prosecutor's argument as concerning Mary's disregard for Brad after she shot him, which was relevant to prove that she possessed the requisite mens rea to commit the charged offenses. Indeed, right before the prosecutor referenced Ryan's 911 call, she argued,

> [Brad] needs help. He needs 911. [Mary]'s in the bedroom. Well, she comes back. She points at the floor, at the door. You got in my space. You were in the room. I told you to get

out. I punished you. It goes on for . . . 13 minutes until help arrives.

Her body language tells us a lot. Even though we can't hear what she's saying, the double hand wave that she does leaning over him, looking at him but pointing at the ground, at the floor, pointing at the lock. She's mocking him. She's not surprised. She's not afraid.

Considered in context, the prosecutor's argument was proper. *See People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010) ("A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts.").

### f. Cumulative Effect

¶ 59 Mary argues that the cumulative effect of the prosecutor's statements deprived her of a fair trial. Because we haven't identified any misconduct, this argument fails. *Cf. Buckner*, ¶ 20 ("If we find multiple instances of prosecutorial misconduct, we 'must carefully review whether the cumulative effect of the prosecutor's statements so prejudiced the jury's verdict as to affect the fundamental fairness' of the trial." (quoting *Domingo-Gomez*, 125 P.3d at 1053)).

### III. Disposition

¶ 60 The judgment is affirmed.

JUDGE LIPINSKY and JUDGE SULLIVAN concur.